HOLMES v. DETROIT, GRAND HAVEN & MILWAUKEE
RAILWAY CO.

RAILROADS — NEGLIGENCE — TRESPASSERS ON RAILWAY TRACK —
GROSS NEGLIGENCE.
Gross negligence was not made out by evidence that defendant's engineer saw decedent and another person upon the
track about 1,500 feet ahead, decedent being upon his hands
and knees, that the engineer gave the usual signals and, when
he saw that decedent was not going to get off the track,
applied the brakes and took the usual precautions for an
emergency, that the engineer did not know they were drunk
when he saw them on the track, and that both being helpless
with intoxication were struck by the locomotive.[1]

Error to Shiawassee; Miner, J.   Submitted January
29, 1912.   (Docket No. 141.)   Decided October 1, 1912.

Case by Henry L. Holmes, administrator of the estate
of Asa Mitchell, deceased, against the Detroit, Grand
Haven & Milwaukee Railway Company for the wrongful
killing of decedent.   Judgment for plaintiff.   Defendant
brings error.   Reversed; new trial denied.

Harrison Geer (W. K. Williams, of counsel), for
appellant.

Pearl L. Sawyer and Odell Chapman, for appellee.

MOORE, C. J.   Plaintiff brought this suit, as administrator of the estate of Asa Mitchell, to recover damages
for injuries received by Mr. Mitchell on the 10th day of
June, 1909, which caused his death a few hours later
through being run over by the defendant's passenger
train, while decedent was a trespasser upon the railroad

---

[1] As to duty of trainmen, upon perceiving object the character of
which is unknown, but which in fact is a trespasser helpless on
track, see note in 2 L. R. A. (N. S.) 498.

track at a point 1,500 feet west of the first highway east of Durand. Asa Mitchell and Fred Snaggs, residents of the village of Fenton, Genesee county, which at the time in question was in a local-option county, came to the village of Durand, which at that time was a place where intoxicating liquors were sold, and became so drunk as to be unable to care for themselves. While intoxicated, they started east from Durand on the railroad track where the injury occurred. The defendant asked for a directed verdict. This was refused, and the case was submitted to a jury. From a verdict and judgment in favor of the plaintiff the case is brought here by writ of error.

Counsel are agreed:

"The only question in the case is, Do the facts as they appear in the record make a case showing the defendant to be guilty of gross negligence?"

The only eyewitnesses of the transaction were the engineer and fireman, who were called as witnesses for the plaintiff and cross-examined by him.

The fireman testified:

"The accident occurred a little better than half a mile east of Durand. I observed deceased upon the track when we were about half a mile east of him.

"*Q.* I wish you would describe the track, and how far you can see down to when you are looking out of the engineer's or fireman's window. How far could you see down the track, how far back?

"*A.* Why, about a mile straight ahead.

"*Q.* You say for about a mile east of where this man was struck you could see right straight down the track, couldn't you, if there was anything on the track or could you?

"*A.* Yes; if you are looking pretty particular.

"*Q.* If you were keeping close watch?

"*A.* Very close watch you might.

"*Q.* But you discovered him about half a mile before you got to him?

"*A.* I saw something on the track about half a mile before we came to him.

"*Q.* How did it appear, whether he was lying down or sitting on the track, standing up, or what?

"*A*. Kneeling down, I thought. He appeared kind of bent over as though on his hands and knees. I saw what I thought was one man.

"*Q*. Did you see another object besides that?

"*A*. I could not tell what it was.

"*Q*. What was the other object like besides this one you thought was a man on his hands and knees?

"*A*. I thought he had a dog or something.

"*Q*. You say that looked like a dog, you thought?

"*A*. Yes.

"*Q*. What was there about it? Can you describe anything about it that made you think this other object was a dog?

"*A*. No; only from the way it was bending over.

"*Q*. That object was bent over?

"*A*. Yes, sir; I suppose it was. I didn't know.

"*Q*. From the shape of this other object besides what you thought was a man on his hands and knees, you thought the other object was a dog?

"*A*. Yes; as near as I could see. I thought it from the shape that the object was in. When I saw those objects on the track, I didn't do anything. We were half a mile away. I said nothing to the engineer. He was looking down the track. He said nothing to me. He appeared to see them at that time. He was looking straight ahead the same as I was. He sounded the whistle. He blew danger signals when he got near them. I think we were about 50 or 60 rods away at the time he gave the danger signals. They consisted of short, quick blasts of the whistle. A service application of the brakes had been made at this time.

"*Q*. You finally went on, and, when you were 50 or 60 rods away, you could plainly see them, couldn't you?

"*A*. Why, yes. We were slowing down quite rapidly when we struck these men. I think we were running about 15 or 20 miles an hour at the time we struck them. I understand to get a train under control means to have it so that you can stop in a short distance. I do not understand that it means to have it so that you can stop almost any time.

"*Q*. If you get what you call having your train under control, how far, if you get under what we call under control, would it go if you would immediately turn on the emergency, and throw the lever over so as to reverse the wheels?

"*A.* That depends upon the weight of the train, what they have got.

"*Q.* Take this train, it had how many cars on? It had the engine, tender, express car, baggage car, and a mail car?

"*A.* I should think two or three car lengths.

"*Q.* Don't you think if you had it under control, and put the emergency on and reversed the engine, don't you think you could stop inside of 100 feet, if you made an emergency stop; never mind whether she breaks the drawheads or not, but just turn the emergency on and reverse her?

"*A.* Well, we would have a train under control under difficult circumstances. Under control—

"*Q.* Having regard to human life, putting it under such control as you would do to save the life of a man so you could stop, I won't say what it ought to be, but under control so as to prevent the taking of human life; isn't it a fact if you would put on the emergency in air and then throw the lever over, reverse her so it would set the wheels going the other way, ought not that train to have been stopped in less than 100 feet? Don't you think that is so?

"*A.* If I had any idea it was to save a human life, I would think I could.

"*Q.* You could stop a train like that, if you have it under control, suppose what we call under control, not going over 15 miles an hour, if you turn on the emergency and reverse her, you can stop her almost instantly, can't you?

"*A.* If a person knew these people were going to stay there, you certainly could.

"*Q.* Suppose you knew if you didn't stop you were going to kill a man, or you were going to kill yourself, suppose you knew, if you didn't stop her, you were going to kill yourself and your fireman; don't you think if you had it under control, not going, as you say more than 15 miles an hour, that if you would turn on the emergency air, and then reverse the lever so as to set the wheels going the other way, don't you think you could stop it almost immediately? Don't you think you could do that?

"*A.* If I knew it was for that purpose, I could prepare before getting near to them; but under that circumstance I couldn't.

"*Q.* Take a time. We will suppose we start right in now, and it comes on you that, if you don't stop that

train, you are going to kill yourself and your partner, and it is only going 15 miles an hour, this train you were on, can't you turn on the emergency air and reverse the lever, and stop it almost immediately?

"*A.* If I knew?

"*Q.* Yes.

"*A.* Well, I should be prepared before.

"*Q.* I don't say about being prepared before. I want you to stop it now going only 15 miles an hour. I will come to this preparing. I will treat you fairly. If you knew right now and your train was only going 15 miles an hour and came on this accident, if you didn't stop it, it was going to kill you and your fireman, couldn't you by turning on the emergency and reverse her, stop her almost instantly?

"*A.* I could not say.

"*Q.* What is your best judgment about that? Don't you think you could?

"*A.* When we were going 15 miles an hour, the emergency brake was on before that.

"*Q.* Suppose this train is going only 15 miles an hour, and you should turn on the emergency and reverse the engine; couldn't you stop it almost instantly? I am going to insist on an answer yes or no.

"*A.* Fifteen miles an hour? No.

"*Q.* I want an answer—yes or no.

"*A.* No; not instantly. The engineer reversed the engine. This helps to stop the train. It locks the wheels. We were running between 35 and 45 miles an hour when I first observed the objects on the track. Going at that rate of speed, we could make a reasonable stop in about a quarter of a mile I think. * * * I think it would take 50 or 60 rods to put the train in condition so that it could be stopped at any time under ordinary circumstances. It would be my estimate that we were running 15 to 20 miles an hour at the time we struck the men. I did not discover there were two men before we struck them. I saw Mr. Mitchell after he was struck. I helped lift him into the baggage car. I think he was about a train length east of where the rear coach stopped."

Direct examination by Mr. Geer:

"The engineer had given the station whistle before the accident occurred. I know where the highway is east of the point where the accident occurred. The station signal

was sounded quite a ways before we came to this highway crossing. The engineer also gave the crossing signal for this highway. He sounded it 40 or 50 rods I should think east of that point. It is 2,000 feet from this highway to the county ditch which crosses the railroad. I have measured it. I was nearly a quarter of a mile east I should think of this highway when I saw a person bending over on the track.

"*Q.* When you saw this person bent over, what did you think he was doing?

"*A.* Why, I did not think nothing only he might have been a sectionman, as you generally see them looking up along the road.

"*Q.* I ask whether or not it is a common occurrence to see sectionmen in substantially the same position this man was in?

"*A.* Yes; regular occurrence.

"*Q.* How near were you to the crossing when you discovered there was some object under him that you took to be a dog?

"*A.* Why, I must have been at the crossing then?

"*Q.* About at the crossing?

"*A.* Yes.

"*Q.* That would be about 2,000 feet east of the county ditch. Where were these men struck with relation to the county ditch, in what direction at the crossing?

"*A.* Between 500 and 600 feet east of that.

"*Q.* So that would be something like 1,200 feet west or a little more of the highway?

"*A.* Yes. The engineer commenced to sound the danger signals when we were just about at the highway, and continued to give them until we struck the men. The service brake was put on before we reached the highway. That would take from five to ten pounds of air off. It was applied at the usual place for the purpose of making a stop at the station. The emergency brake was applied very soon after the engineer started to blow the alarm whistles. He applied the brake as soon as he started the alarm whistles. If the emergency brake had not been applied, the train would have ran much faster than it did. The train was running 35 to 45 miles an hour when we were a quarter of a mile east of the highway. The service brake checked the speed of the train some. The track is downgrade towards the west all the way from Gaines to Durand. The service application of the brake would

check the speed of the train just a little.   I think we were running 25 to 35 miles an hour when we went over the highway.   The bell was ringing.   It is an automatic bell rung by air.   I put some coal on the fire east of the crossing.   I did not put in any coal after we had passed the highway and before the accident occurred.

"*Q.* I will ask you if at any time you had any knowledge or information in any form that the people who afterwards turned out to be individuals on the track were intoxicated ?

"*A.* No, sir.

"*Q.* Was there anything in any shape or form to indicate to you there was any reason why they shouldn't get off from the track ?

"*A.* No, sir.

"*Q.* What, if anything, was there in the actions or conduct of the men that you saw on the track to indicate to you that they were not aware of your approach ?

"*A.* There was nothing.

"*Q.* Were you at any time before the collision occurred in any way advised that either of them were intoxicated ?

"*A.* No, sir.   The engineer started sounding danger signals about the time we crossed over the highway.   We were east of the crossing a little when he commenced sounding these warnings.   We were a little west of the crossing when he applied the emergency brake, but it was shortly after we had passed over the highway.   Applying this brake reduces the speed of the train.   The emergency brake was on in full force, and was left on.   We were about six rods I should say from this man before I discovered that he was not going to get off the track.

"*Q.* I will ask you how this man's position on the track compared with the position of sectionmen that you had seen before that examining the track ?

"*A.* It was the same natural position.

"*Q.* So the jury may know in what position you have seen sectionmen frequently as you are coming over the road ?

"*A.* They are frequently down looking at the rails to see if there is any humps in the rails.

"*Q.* I will ask you when you first saw this man leaning over what you supposed to be a dog or something else, whom did you think it was ?

"*A.* I thought it was one of the sectionmen.

"*Q.* I will ask you when was it with relation to the col-

lision that you discovered that there were two men, instead of one?

"*A*. After walking back up the track.

"*Q*. Up to that time had you any knowledge that there were two men, one man over the other?

"*A*. No, sir. It was not possible for the engineer to have stopped this train before the collision at a time we were within five or six rods of these men. They were right between the rails and nearly in the center of the track, a little to the left side of it. There is no road or public crossing between the highway which I have mentioned and Durand station. This ditch which I have spoken of is a county ditch, and there is a culvert over it. The accident occurred about 2 o'clock. The engineer was John McKay."

The engineer testified:

" I was an engineer on the Detroit, Grand Haven & Milwaukee Railway on the 10th of June, 1909. I ran between Detroit and Durand that day. I was due at the latter place at 2:05 p. m., I think. I noticed something on the track ahead of the train just before we reached Durand. I could not tell what it was until I got close enough. It was two men. One was underneath and the other was on top. The one on top was on his hands and knees. I thought before I got there that it was a trackman squinting the track. He was about like this [indicating] toward the left rail, looking toward the east, toward the engine. He wasn't exactly across the track. He was near the left rail until we got very close to them, and then he turned and looked around. We were only about six rods away from him at that time. I think he attempted to get off the track after that. He did not have time to get off. I observed the objects on the track before I whistled for the station, which was about half a mile away. I whistled before we got to the road crossing. I also sounded the crossing whistle. I then gave the danger signals two or three times. I did not know but what they would get off the track. The station whistle is the first signal I gave. We were about 80 rods east of the crossing at that time. I then gave the crossing signal. We were probably 90 rods away when the station whistle was given, and 80 rods when I sounded the highway crossing signal. I have never been down there to make any measurements. We were about 90

rods from the crossing when I first noticed the men on the track ahead of me. If I remember right, I sounded the danger signals two or three different times. I kept whistling at them, and, when I saw they were not going to get off the track, I tried to stop, and made every effort I could when I saw they were not trackmen. I do not think I could state when I first saw them that the object on top was a man. I discovered this when I started to blow the danger whistle at the highway. The men were about 1,400 or 1,500 feet west of the highway.

"*Q.* Why is it that you didn't stop after noticing that the object on top was a man?

"*A.* Gracious, if I did, I would be stopping every little while, because you see trackmen squinting the track nearly every day.

"*Q.* You see men on the track like that nearly every day?

"*A.* Yes, they always get down like that when they squint the rails.

"*Q.* And is it usual to see people down in that position with something under them?

"*A.* No; I don't think it is.

"*Q.* Didn't you notice before you got there that there was something underneath this man?

"*A.* Just about the same time.

"*Q.* What did you think the object was?

"*A.* I didn't know. I was expecting every minute that they would get off the track. I didn't have any idea they was going to stay there. * * * There was sand used that day, but I think she would skid the drivers, anyway, even if the track was sanded. I sanded the track that day. I commenced when I put on the emergency brakes. I did not put on this brake when I commenced to sound the danger signal. I did not put it on until I saw they were not going to get off the track. Then I put her on for all she was worth. It was my judgment that it is not possible to stop such a train as I had, using all the methods in my power, within a distance of 500 or 600 feet, with a low-pressure brake. We must have been going 15 or 18 miles an hour when we struck the men. I probably ran a train length and 100 feet more after striking them. The emergency brake was on until the train stopped."

Direct examination by Mr. Geer:

"I am about 53 years of age, and have been an en-

gineer 30 years, all the time on the Detroit, Grand Haven
& Milwaukee Railway. I was on No. 13 on the day in
question. When I first discovered an object on the track,
we were about half a mile east of it. I could not tell at
that time what the object was. There is a vibration when
you are driving an engine, and this interferes with deter-
mining what an object ahead is. I thought it was a
trackman at the time I gave the station whistle. It is a
common thing to see trackmen squinting the track. The
position they would occupy in so doing is just about the
same as this object was in. The object of squinting the
track is to get the level of the rails. The trackmen do at
times get down in that position to see how an engine rolls
on the rails. My custom when I see trackmen looking
towards the engine is to give them the danger signals.

"*Q.* After you gave them danger signals, they still re-
mained on the track?

"*A.* Yes, sir.

"*Q.* On this occasion, until you got within five or six
rods, you didn't know the difference but what they were
trackmen?

"*A.* No, sir. I expected they would get off every
second.

"*Q.* Were you in any way advised by any action on
their part that they were intoxicated?

"*A.* No; not a thing. The bell on the engine was
ringing. It rings automatically. I fixed the distance
that these men were from the highway crossing by esti-
mate, and not actual measurement. I fixed the place
where I blew the whistle by the highway crossing. I
continued to sound the danger signal until the accident
happened. I did everything I could to stop this train
after I saw they were not going to heed the signal I had
given them. When the emergency brake has been ap-
plied, there is nothing else you can do to stop a train.
Reversing the engine would have been a detriment. It
would have caused it to slide. The wheels skid right
along, and don't take hold near as much as when the
emergency brake only is applied. Sometimes we get very
anxious and reverse the engine, though. I could have
done no more than I did to have stopped that train after I
discovered those men were not going to get off of the track.
They were near the south rail. The road is quite a down-
grade from the highway crossing to where the accident
occurred."

In addition to this testimony was the testimony of the baggageman:

"This train stopped about half a mile east of Durand, just east of the culvert which the track crosses. I saw after the train stopped the man lying near the track. I got off the train immediately after it stopped. When I got off, I went to the rear of the train and a little bit further. I saw the limb of a man. It had a rubber boot on. I then returned to the train, and signaled it to back up. It went about a train length and stopped. I then went farther east, and found a man sitting in the ditch. He was more sitting up than lying down. I again came back to the train, and signaled them to come east. They backed the train until the baggage car was about opposite this man. Then I stopped it. I got in my baggage car. The train backed up about twice its length altogether. * * * Our train consisted of an engine, two coaches, baggage car, and a combination mail and baggage car. I should judge the coaches were about 60 feet long. They were a trifle longer than the mail and baggage car. I judge the engine and tender was about as long as the cars. I think all told the length of the train was somewhere near 300 feet. I judge that the train ran 400 or 500 feet or nearly that distance after striking these men."

Direct examination by Mr. Geer:

"I know where the highway is just east of the culvert. I judge the distance is half a mile. I never measured it. I am simply giving my best judgment. This culvert goes over the county ditch. The highway is the first road east of Durand, and is somewhere near a mile from the Durand station. The distance is estimated. I know the station signal was given before the accident occurred. That is one long blast of the whistle. I know that the crossing signals were also given. Those are two short and two long blasts. The crossing whistle was for this highway east of Durand. The whistling post for this crossing is to the east. I also heard the danger signals sounded. They are continuous short blasts of the whistle. Shortly after those danger signals were sounded, I was thrown over upon my hands and knees upon the express by the emergency brakes being thrown on. I did not look out of the car to see where we were at the time the emergency brakes were applied, nor can I tell where we were when the signals were given."

This is all the testimony as to the accident.

It is claimed from this testimony, and we have quoted all that was important, that gross negligence might be inferred. We quote from the supplemental brief of appellee:

"It is not necessary for the plaintiff, in order to show gross negligence, to prove that the defendant's servants in charge of that engine and train knew the deceased was incapacitated and unable to get off the track, and then wilfully and maliciously run the train against him, after having time to stop and avoid injuring him. This court has repeatedly held that where a person by the exercise of the most ordinary care should have known of the precedent negligence of the plaintiff and of his peril, and subsequently does him an injury, it is gross negligence."

Counsel cite a number of cases in support of their contention. The first one is *Lake Shore, etc., R. Co.* v. *Miller*, 25 Mich., and counsel quote from page 279. The quotation is too brief. We quote as follows:

"But if an engineer sees a team and carriage, or a man in the act of crossing the track, far enough ahead of him to have ample time, in the ordinary course of such movements, to get entirely out of the way before the approach of the engine; or if he sees a man walking along upon the track at a considerable distance ahead, and is not aware that he is *deaf* or *insane*, or from other cause insensible of the danger; or if he sees a team or man approaching a crossing too near the train to get over in time, he has a right to rely upon the laws of nature and the ordinary course of things, and to presume that the man driving the team or walking upon the track, has the use of his senses, and will act upon the principles of common sense and the motive of self-preservation common to mankind in general; and that they will, therefore, get out of the way,— that those on the track will get off, and those approaching it will stop, in time to avoid the danger; and he, therefore, has the right to go on, without checking his speed, until he sees that the team or the man is not likely to get out of the way, when it would become his duty to give extra alarm by bell or whistle, and, if that is not heeded, then, as a last resort to check his speed or stop his train, if possible, in time to avoid disaster. If, however, he sees a child of tender years upon the track, or any person known to him to be, or from his appearance giving him good rea-

son to believe that he is, insane, or badly intoxicated, or otherwise insensible of danger, or unable to avoid it, he has no right to presume that he will get out of the way, but should act upon the belief that he might not, or would not, and he should therefore take means to stop his train in time. A more stringent rule than this—a rule that would require the engineer to check his speed or stop his train, whenever he sees a team crossing the track or a man walking on it, far enough ahead to get out of the way in time, until he can send ahead to inquire why they do not; or which would require the engineer to know the deafness or blindness, or acutness of hearing or sight, or habits of prudence or recklessness, or other personal peculiarities of all those persons he may see approaching, or upon the track, and more especially of all those who may be approaching a crossing upon the highway, though not seen —any such rule, if enforced, must effectually put an end to all railroads, as a means of speedy travel or transportation, and reduce the speed of trains below that of canal boats 40 years ago; and would effectually defeat the object of the legislature in authorizing this mode of conveyance. But how are railroad companies, or their engineers or employés, to know the personal peculiarities, the infirmities, personal character or station in life, of the hundreds of persons crossing or approaching their track? By inspiration or intuition? And, if they do not know, then how and why shall the company be required to run their road, or regulate their own conduct, or that of their servants, by such personal peculiarities of strangers of which they know nothing? These questions suggest their own answers."

This authority, instead of supporting the claim of plaintiff when applied to the facts of this case, is an authority the other way. The case of *Keyser* v. *Railway Co.*, 56 Mich. 559 (23 N. W. 311, 56 Am. Rep. 405); *Id.* 66 Mich. 390 (33 N. W. 867), cited by counsel, is easily distinguishable from the instant case, as the person injured was an infant boy 2½ years old. In the case cited by counsel of *Bouwmeester* v. *Railroad Co.*, 63 Mich. 557 (30 N. W. 337), a verdict was directed upon the opening statement of counsel. This statement in part was that deceased was rightfully upon the track; that the men in charge of the train saw him; that he was unconscious;

that the train was approaching; that this was known to the engineer; that the deceased did not hear the signals, and that his actions were such as to convince any engineer or fireman of that fact; that after they saw that the alarm bell and whistle were not heeded by Brandel, and knew it was necessary to stop the train to save his life and knew that they could stop it, they negligently failed to do so. This case was very clearly different from the instant case. In *Battishill* v. *Humphreys*, 64 Mich. 514 (38 N. W. 581), cited by counsel, the person injured was a little girl two years and seven months old. The other cases cited are *Laethem* v. *Railway Co.*, 100 Mich. 297 (58 N. W. 996); *Montgomery* v. *Railway Co.*, 103 Mich. 46 (61 N. W. 543, 29 L. R. A. 287); *Herrick* v. *Wixom*, 121 Mich. 384 (80 N. W. 117, 81 N. W. 333); and *Schmidt* v. *Mining Co.*, 159 Mich. 308 (123 N. W. 1122). Without stopping to analyze these cases, it is sufficient to say that each of them differs essentially from the case at bar.

The testimony of the engineer and fireman is not ambiguous. It is clear and distinct and to the effect that, as soon as it was apparent the decedent would not heed the signals, every effort was made to stop the train. It is not conceivable that one in charge of a locomotive would willingly run over a person that he knew would not pay heed to the signals of danger. If human instinct would not deter, self-interest would. The life of the engineer and fireman would be placed in more or less danger, the passengers in the train behind would be endangered. There is an entire failure to show negligence so gross as to create liability. See *Strong* v. *Railway Co.*, 156 Mich. 66 (120 N. W. 683); *Levy* v. *Railway Co.*, 164 Mich. 572 (129 N. W. 683); *Knickerbocker* v. *Railway Co.*, 167 Mich. 596 (133 N. W. 504). The request for a directed verdict should have been given.

Judgment is reversed, and no new trial ordered.

STEERE, McALVAY, BROOKE, STONE, and OSTRANDER, JJ., concurred. BIRD, J., did not sit.